14-5068 Brenda Margeson v. White County TN et al. Oral argument not to exceed 15 minutes per side. Mr. Schmidt for the defendant's appellant. Good morning your honors. My name is Michael Schmidt. I'm here this morning representing Chris Isom, Joseph Williams, and Richard Lynch. And if I may, I'd like to reserve three minutes of rebuttal time. You may. Before I get into my argument, I just want to bring to this court's attention, in my brief, there's a suggestion that there's a neighbor that witnessed this shooting and actually had the same opinion as some of the officers. I suggest to you, if you picked up on that, that was sloppy drafting and that that is not involved in this case. I'd like to start off by talking about why this court has appellate jurisdiction to hear this matter in the first place. This case involves a shooting of an individual who pointed two weapons at the officers as they are trying to execute a capious bench warrant for his arrest. And the district court found that there was no question of fact that Mr. Margison pointed a SKS rifle at the officers. Rather, the court concluded that based upon the party supplemental briefing, he couldn't tell how many shots were fired. Based upon my review of the evidence, I suggested possibly 15 because that's how many shell casings were found. Based upon Mr. Margison's evidence, somewhere in the range of 39 and 43. And the court said, I don't know. There's a question of fact. I propose that the court earned this fact in this finding because what it should have done, I believe, as instructed in Scott v. Harris footnote 8, is to take all the facts and the inferences in favor of the plaintiff. And in this case, the plaintiff said we shot 39 or 43 times. But isn't it the case that the court has to look at in this totality of the circumstances? The whole quantum of shots fired and the testimony really of the officers, which about which there is, I think, some disagreement. Some officers said we heard shots and we shot. Isn't there a question about whether or not at least a couple of the officers even saw Mr. Margison shoot? They responded in aid of their fellow officer, did they not? Well, of the three officers that are before the court today, only one of them testified that he did not see Mr. Margison before he shot. Chris Isom pulled into the door and saw Mr. Margison come up with the gun and he immediately shot one shot. Richard Lynch heard that shot and testified he didn't know where that shot came from, but he also saw Mr. Margison with the gun. He fell backwards and started to shoot. So in that quantum of evidence, how can you say so definitively that the judge erred in the judge's determination? Well, I think if you put yourselves in the moment of the officers having to face this very dangerous situation where there's a high-powered rifle pointed at them. It's reasonable for them to not come away from this with the same memory. And I don't think that precludes summary judgment or qualified immunity. I think what this court should look at is whether or not there's any evidence, any suggestion in the record at all that a shot was fired while Mr. Margison no longer was a threat. And I think that's what the district court suggested was if you're firing 43 times, maybe some of those shots were fired after it was necessary to fire any shots. But it's also, isn't it, it's not just the total quantity. He states this one shot, then pause, then four shots, then pause, then 12 shots, and then more shots to where, as I read it, he's simply saying that there's a genuine issue as to the timing and sequence so that if some of those shots were fired after he was no longer a threat, then plaintiff would have a case and that is the view of the facts in his favor. Well, the Chappelle v. City of Cleveland case that I cited to this court addresses that issue. And in that case, the Sixth Circuit made clear that you're not to make inferences from an absence of facts. That you don't look at an absence of facts in the records and suggest what might be. That type of hypothetical rulings is not appropriate. But here it's not an absence in the sense that, since apparently we don't, that there's a dispute as to what the timeline is. That plaintiff's version of the facts is that at least as many shots as the judge said were fired and we don't have an agreement on what the sequence is. Well, I think I'm forced to agree to the sequence that is most favorable to the plaintiff. You're, at page 32 of your brief, which I think you have to for us to have jurisdiction, you say officers are willing to concede plaintiff's version as to the number of shots. To the extent it's supported by the record, but I'll go ahead and suggest that. I agree. The sentence doesn't say that. But certainly the discussion of how many holes there were in Mr. Margison and how many holes there are in the house, while they may be disputed, they're consistent with a very large number in the range of 40. Is that fair? That is fair. And so let's suggest that they're correct, that there were four rounds of shots, such as the judge suggested, and that there was 40 shots fired. And I brought to this court's attention when I recently found the Plumhoff versus Ricard case, which very specifically rejects the idea that the number of shots fired is of any relevance. Any relevance? Because the number correlates to the time. That is, if this were a case where there's no dispute that he comes out with the rifle, and there were 40 shots fired and that was the end of it all at once, or very close, we probably wouldn't be here. But it's clear that there was some level of sequencing, correct? There was some level of sequencing. Because even your side says he came out with the rifle, there were shots, he was shot, then you say he came out with the pistol, and there were more shots, right? That's correct. So the question is, given the district court's finding, in order for us to have jurisdiction under Johnson v. Jones, you've got to concede their version of the facts, and under their version of the facts, that some of the shots were fired after he was already down and not a threat. How can you not have a genuine issue there? I guess I would disagree with the fact that there's any evidence whatsoever that there was a shot fired after he was down and there was not a threat. The undisputed evidence before this court is he pointed the SKS rifle, he pointed a handgun at the individuals, and Detective Capps testified, and Detective Capps is not before this court, but he had rotated outside of the door, and he testified that he came in after the shots were fired and pulled the weapons away from Mr. Margeson, who was still alive. And there's the unreported case, actually it's not the unreported case, it's Boyd v. Baffler, where there was a gentleman who had pointed a gun and he had been shot once, it struck his spinal cord, and it paralyzed him from the base down. The officers at the time didn't know that, and he fell down. And in that case, they had experts that said you can't, when you get a spinal cord injury, you wouldn't be able to raise the gun again because they shot him multiple times. Those things go to factual issues, and it seems to me, even in your argument, you're conceding that there is an issue of fact, that reasonable minds can look at this, but I thought your position was that these officers are entitled to qualified immunity in this situation. Well, I guess it's both that their conduct was reasonable, and therefore didn't violate the Fourth Amendment, and therefore they're entitled to summary judgment, and that even if their conduct was not reasonable, there's no law that says the number of shots by itself. It's not the number of shots. I think the problem, at least for me, the problem is your statement, I take it, is that the truth here is that there were no shots fired after the time that he was no longer a threat. That's correct. And the timeline of the shots being fired is not matched up with the story to the extent that there's no genuine issue of fact. For example, what was the timing of this fourth volley, more shots even after the 12th? We don't know. Your position is that those must have happened earlier. The other side's position is that they happened later, and that's a genuine issue. We have to take inferences here. The jury may believe it or not, but you raise Scott v. Harris. There you had a video where you could allegedly see exactly what happened. Here you have some audio, but how can we say that there's no dispute that none of those bullets happened after he was completely disabled? What's your best argument on that? On that, I would rely upon Chappelle, because the three officers who've all testified in this matter, and there's no question that they're the only people who saw what happened, all testified that they fired while he was pointing either. the SKS rifle or the handgun at them. The district court said, well, we can't just believe these self-serving statements by the officer, and I would suggest that you can if there's no circumstantial evidence that suggests that their statements are incorrect. But if there's no circumstantial evidence, isn't it that there is no evidence that matches up the evidence that we do have of the disputed number of shots with their testimony? That is, you would have a better case if they could indicate, we shot four times when he was standing in the doorway, then we shot 12 times while he had the pistol aimed at us, and all the remaining shots, he still had the pistol aimed at us. But they don't do that, they just give their general statement, correct? We don't have video of what the timing was. That's correct, and I'm not sure that if this goes to trial, that that evidence is ever going to be, if that's something for the jury, because the individuals that shot themselves said, I don't know. Mitchell Glint said, I don't know how many shots I fired. I fired, I kept on firing until the threat was gone. In trial, the jury would have an opportunity to hear the explanation of that sequence that Judge Boggs mentioned earlier, because that's in the record, and there is, I think from the dash recording or something, there is actually evidence of the sequencing and the spacing. Well, I think this, I have no idea what happened on that day, but if you point a gun at an officer, there's no case that says you have to fire in any sort of sequence, that you can't start firing, stop firing, start firing again. In fact, Plumhoff says, and it makes clear, once you have the right to use deadly force, you have the right to continue to use deadly force until the threat is gone, and whether that's in spurts, whether that's in one shot or a hundred shots. That's exactly what the issue is. Your time's up. My time's up. Thank you. Good morning to the court. My name is Michael Savage, and I represent Brenda Margison, the widow of the deceased. Basically, there are issues of fact here, as I think from the court questions, it's already been touched on. If you look at what the police officers were saying, they said basically that there were two volleys of shots. Mr. Margison came to the door, they claim, had a rifle, pointed it at them. First volley. Mr. Margison falls to the ground. Mr. Margison pulls out a handgun. Second volley. That does not explain what the district court heard on the tape. A shot, pause, four shots, pause, 12 shots, pause, then even more shots. In that statement about pauses and so on, and I actually didn't even look as to whether the tape itself is in the record, what's your understanding of the total time from the first shot to the last shot? I don't know that a total time was established, Your Honor. I'm sorry? I don't know that a total time has been established. Is the tape in our record? I believe it is, Your Honor. I believe that the plaintiff's counsel put that in the record. Because what you've just said is consistent with Isom's statement that Isom fired the single shot, following which there is then what I would call the first volley, the four shots. Then the 12 is the second volley, and then the district judge at least says the third. Is that fair? That's fair, Your Honor. I would say that. But the issue here is this. There were officers there who said they never saw Mr. Margison with a gun.  Officer Whitson at his deposition said he didn't see him with a gun, but it's important to note that in the TBI report that he gave, he said he saw him with a gun. He changed what he had said from the time he talked to the TBI until his deposition. Officer Williams, who fired at least two shots at Mr. Margison, said he never saw him with a gun. In terms of what relevance that is, is it that you argue that that's also a contested issue of fact? Because the district court seemed to put it as a finding that he had a gun. He did, Your Honor. The district court did put it as a finding, but we contest that. I think one thing that makes that obvious, if you look at Officer Williams' testimony, it becomes clear. Officer Williams stated very clearly in his testimony that when he fired the first shot at the door, that he couldn't see Mr. Margison at all. He fired it at the door. That's Williams, but it appears that Isom fired the first shot in time. Williams' first shot, he couldn't see him. That is correct, Your Honor. The reason I'm pressing this is the following, that under Johnson v. Jones and so on, if we start with he had no gun at all, which they obviously don't concede, then we shouldn't be here at all if that's a genuine issue at this point. Now, I thought Johnson v. Jones is, you start with what the district court thought were genuine issues, and the district court didn't think there was a genuine issue as to his having a gun. The district court ruled that, Your Honor. That is correct. For our deciding this qualified immunity, that doesn't mean if you go to trial, you can't contest it. But for us deciding this, I think we have to say he did have a gun. Well, I think it... Otherwise, we wouldn't be here at all, right? That's true, Your Honor, but I think it also shows that there is an even more question of fact. Officer Williams very clearly said that when he stepped to the right, he could see Mr. Margison's shoulder. And he very clearly testified that Mr. Margison was standing up when he fired that shot. According to the officer's testimony at the scene, when Mr. Margison was standing, he had a rifle. Officer Williams said, I didn't see the rifle. If Mr. Margison was standing up, and Officer Williams testified that he could see his shoulder, he didn't say which shoulder, and that rifle was pointed out to these officers, how could he not possibly have seen it? It was a long gun. There is no way that Officer Williams wouldn't have seen that rifle. So I bring this issue, and I think Your Honor's correct. I bring this issue to state this places everything the other officers said in doubt about the gun. There is a question of fact. There's a question of fact about whether he even had a gun. There's a question of fact about did he point it at them. There's a question of fact about the number of shots fired. And that's why we think the qualified immunity should be denied. That's why we think that the trial court should be upheld. I know there's this officer named Capps who is involved in this as well. Is he not a defendant for some other reason, or did he not fire any shots? Because he's up in the alley. Because there's talk about him being in the doorway at one of the crucial points. I wondered what the story on that was. He is the officer that when the police arrived, he charges up to the door. Ms. Margerson opens the door, and eventually, I believe it was him, I don't want to make a wrong statement here, but I believe it was him, pulled her out of the house. He's armed with a shotgun. His testimony was that he fired the shotgun, but that it failed to fire. He attempted to fire it, but it failed to fire. So he's here, and his testimony is that he's rolling in and out of the door. He looks in, sees Margerson, comes back out, looks in again, sees Mr. Margerson again. I would point out to the court that through all this time that Mr. Margerson is supposedly threatening these officers with this gun, no evidence that he fired either of those guns, none whatsoever. So here was a man that had... If he's pointing the gun at him, there's a lot of law that they're entitled to use deadly force then. I would agree with that, Your Honor. But I think it goes to the evidence as to what it is what they're saying the truth. If Mr. Margerson had this gun and he's pointing this gun, 21 shots in him before he's dead, why would he not have fired at least one of the guns if he was that determined? I think that goes to our belief that shots were fired after he was down and that it was excessive. Now, the part about caps that I had in mind, I know about his pulling Margerson, but I guess this is from their brief, but they take Isom's deposition. He says he saw caps in the doorframe and Isom comes up and caps is saying put the gun down, put the gun down. So I have the feeling that caps is up in the house at the time that we've got the pistol situation argument. So I was just trying to see that whatever caps did there, he didn't do any more shooting. Is that why he's not a defendant? I think that's correct, Your Honor. Okay. I think that's correct. Your Honor, it has hit on another point. The officers testified variously as to what was said as they went up to the house. Officer Lynch testified very clearly that they announced themselves as police officers. I know this is a side issue, but again, it goes to the credibility of their whole statement. He testified that they announced themselves as police officers. Officer Isom said, I can't say that anyone did. There's also issues as to what was said. Some people are saying they heard, show me your hands. Well, I would submit to the court that if Mr. Margeson had a gun already in his hands, why would somebody be saying, show me your hands? Why wouldn't they be saying, drop the gun? Which some people heard, drop the gun. So I say all that again to say there is enough doubt here. This court is very well aware, I'm sure, of Jefferson v. Lewis. Police officers are testifying as to what has happened. This court is very well aware of the fact that they're self-serving statements, that you can look at circumstantial evidence, other evidence in their testimony, to get to the truth of what's happened, and we think that we've got enough evidence to show that. Do you know what the record reference for the tape would be? I do not, Your Honor. We can find it if need be. Okay, go ahead. Unless the court has questions, that's my argument. Judges, anything else? Okay, thank you. Thank you. You have three minutes for rebuttal. As far as the tape, that was not relied upon by my clients in their brief. I know that the appellees relied upon the court's view of the tape, and so I made the determination that I would send that as a late exhibit, just so the court would have that. And I did send that via not so much an exhibit, but I talked to the clerk of the court, and she said mail that to her. So that's lodged with us. Was it an exhibit in the court below? It was an exhibit in the court below. Obviously, you can't electronically. Now with electronic filing, you can't just have a click link. Okay, so we could get it from the clerk if we wanted to. I believe so, Your Honor. The district court did have that. The district court did have that, and there's been a lot of reference. That's really the source of the 1, then 4, then 12, then more. That's correct. And the issue, or what I have yet to be shown or discover for myself, is what is out there, what case is out there, that had my officers known before this instance occurred, that their conduct violated clearly established law? What did they do? Everything that they say happened, it all happened. Their argument is that they shot him after he was no longer a threat, and the dispute obviously comes, he clearly was shot to where he went down to at some point he was no longer a threat. The officers agree to that, and they say we just didn't shoot him after that point. And their side is, you did. I'm not sure if their conclusion that we shot them after he went down should be afforded any sort of weight with this court, because I don't know any facts that they're drawing this from other than the number of shots fired. And the length of time and the sequence. And the length of time. And when it's undisputed that the shots were done being fired, Mr. Margison was on the floor with both weapons within his arm's reach, and he was conscious, he was speaking, he was alive, and he was still a threat. Why do you say that's undisputed other than the officer's statements? That is, we don't have what you had in Scott v. Harris, for example, would be a video or video audio showing the facts that you've stated. Well, circumstantially, we've got Mrs. Margison saying that immediately before this, Mr. Margison took his handgun out, put it underneath his pillow, and took his SKS rifle and put it under the couch. So he's got those within his reach. Okay, now I'm good on that. And that I guess I'm not sure what circumstantial evidence would suggest that there was any shots fired after Capps entered the doorway and pulled the guns away, except for the pure fact of the number of shots and the sequencing of the shots, which Plumhoff said and clearly rejected when the respondent said, even if the decision to shoot at the car as it was driving away was reasonable, shooting 15 times was unreasonable. And the court said no. Okay, any other questions? Thank you, counsel. Thank you very much. Time has expired. The case will be submitted. The clerk may call the next case.